IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-135-FL

NORTHERN CAROLINA SUPPORTED )
EMPLOYMENT, SENECA NICHOLSON )
and ALAN PITTS, )
)
Plaintiffs, )
)
) **ORDER AND**
) **MEMORANDUM AND**
v. ) **RECOMMENDATION**
)
NORTH CAROLINA DEPARTMENT )
OF HEALTH AND HUMAN SERVICES, )
ET AL., )
Defendants. )

This matter is before the court for review of Plaintiffs Alan Pitts' ("Pitts") and Seneca

Nicholson's ("Nicholson") *pro se* amended applications to proceed *in forma pauperis* and amended

complaint[1] pursuant to 28 U.S.C. §§ 1915(a)(1), (e)(2)(B). [DE-3, 7-8, 9]. In accordance with 28

U.S.C. § 636(b)(1)(A), this court will also consider Plaintiffs' motion to seal and motion to

supplement. [DE-11].

Plaintiffs Nicholson and Pitts have demonstrated sufficient evidence of their inability to pay

---

[1] On 3 June 2010, Plaintiffs filed a "First Amendment of Right" [DE-9] and a memorandum in
support thereof. [DE-10]. Plaintiffs' proposed amendment to the complaint contains additional
factual allegations occurring subsequent to the filing of the complaint on 5 April 2010, claims
against two additional defendants, Linda Pace and Vivian Person in their individual and official
capacities, and a revised case caption that now reads "ALAN PITTS, *pro se*, and SENECA
NICHOLSON, *pro se*, d/b/a NORTHERN CAROLINA SUPPORTED EMPLOYMENT." Am.
Compl. at 7-19 [DE-10]. Rule 15 of the Federal Rules of Civil Procedure allows a party to "amend
the party's pleading once as a matter of course at any time before a responsive pleading is served."
FED. R. CIV. P. 15(a). As no responsive pleading has yet been filed, Plaintiffs may amend as a matter
of course. Therefore, Plaintiffs' complaint is deemed amended to include the facts and allegations
of the amended complaint and those facts and allegations of the original complaint not superceded
by the amendments. *See* FED. R. CIV. P. 15.

the required court costs.[2] Accordingly, it is hereby ordered that the amended applications to proceed *in forma pauperis* be allowed. It is ordered further that Plaintiffs' motion to supplement is allowed and plaintiffs' motion to seal is denied as moot. For the reasons set forth below, it is recommended that Plaintiffs' amended complaint be dismissed.

## I. STATEMENT OF THE CASE

On 5 April 2010, Plaintiffs initiated this action, setting forth three federal claims and several state law claims against defendants North Carolina Department of Health and Human Services ("DHHS"), Division of Vocational Rehabilitation, Henderson Office ("the Division"),[3] Edward Davis ("Davis"), in his official capacity only, and Stacy Thompson ("Thompson"), Dianne Jones ("Jones"), Cynthia Alston ("Alston"),[4] Victoria Klah ("Klah"), Gordon Agingu ("Agingu") in their official and individual capacities (collectively "the defendants").[5] Compl. ¶¶ 1.7-1.12 [DE-3]. On 3 June 2010, Plaintiffs filed an amended complaint, adding as defendants Linda Pace ("Pace") and Vivian Person ("Person") in their official and individual capacities. Am. Compl. ¶¶ 4.4-4.5 [DE-10].

---

[2] As explained in this court's 3 May 2010 order [DE-6], Northern Carolina Supported Employment ("NCSE") is an unincorporated sole proprietorship and may not petition the court to proceed *in forma pauperis* status because section 1915 applies only to "natural persons" and does not extend to sole proprietorships. *See Rowland v. California Men's Colony*, 506 U.S. 194 (1993) (holding only natural persons may qualify for *in forma pauperis* status under § 1915).

[3] The causes of action arising under federal law are asserted against the individually named defendants only. *See* Compl. ¶¶ 4.1-4.13

[4] In the caption, Plaintiffs identify Alston as "Alton." However, throughout the body of the complaint, Plaintiffs consistently refer to her as "Alston." *See e.g.*, Compl. ¶¶ 1.11, 3.26, 4.3, 4.11, 4.14-4.17.

[5] Davis works at the Division's headquarters in Raleigh, Thompson and Jones are employees of the Division's local office in Louisburg, North Carolina and Aslton, Klah, Agingu, Pace and Person are employees of the Division's local office in Henderson, North Carolina ("Henderson Office"). Compl. ¶¶ 1.7-1.11.

2

On 22 July 2010, Plaintiffs filed a motion to seal, requesting unidentified portions of the record be placed under seal to protect the confidentiality of NCSE's clients. [DE-11 at 1]. Plaintiff filed also a motion to supplement the record with a letter dated 18 July 2010 to Tory Justesen, Act Commissioner of the U.S. Department of Education's Rehabilitation Services Administration ("RSA"). The stated purpose of the letter is to alert the Department of Education of non-compliance by the state of North Carolina with the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. [DE-11 at 2]. While the letter provides a brief summary of unlawful acts against NCSE allegedly committed by the defendants, the crux of the letter concerns perceived inadequacies of the State Plan for the North Carolina State Vocational Rehabilitation Services Program.[6] In particular, Plaintiffs argue the state plan's policy regarding individuals with "most significant disabilities" does not comply with the Rehabilitation Act. [DE-11 at 6-7]. Accordingly, Plaintiffs contend the state must return federal funds made available under the Rehabilitation Act. [DE-11 at 5].

## II. STATEMENT OF ALLEGATIONS

The gravamen of Plaintiffs' complaint is that defendants have engaged in an organized

---

[6] The Division, a recipient of federal financial assistance, is responsible for the state vocational rehabilitation services program under Title I, part B of the Rehabilitation Act of 1973, 29 U.S.C. § 720 *et seq*., and for the state supported employment services program under Title VI, part B of the act, 29 U.S.C. § 795g *et seq*. *See* North Carolina Dep't of Health & Human Servs., The Office of Citizen Services, http://www.dhhs.state.nc.us/ocs/title6.htm (explaining "Title VI applies to on any organization or individual that receives Federal financial assistance, either directly or indirectly through a grant, contract or subcontract; is covered by Title VI . . . includ[ing] DHHS . . . ."). The Rehabilitation Act establishes the legal requirements of each state vocational rehabilitation program in its provision of vocational rehabilitation services for its disabled citizens. 29 U.S.C. § 720(2). The act requires each state vocational rehabilitation program to submit annually a state plan indicating how it will comply with the statutory provisions of the act and the implementing regulations and the administrative requirements of the RSA. 29 U.S.C. §§ 702, 721.

3

scheme to force NCSE out of business. Plaintiffs are African-Americans and serve as managing officers and sole shareholders of NCSE. Compl. ¶ 1.4. NCSE is a Community Based Rehabilitation Facility which provides occupational rehabilitation services and job placement for individuals with disabilities. Compl. ¶ 3.2. The Division refers persons, identified in the complaint as "consumers," to NCSE for occupational training. *Id.* The Division is NCSE's sole source of its consumer referrals. *Id.*

In Count One of the complaint, Plaintiffs seek to establish a civil claim against Agingu, Klah, Alston, Thompson, and Person under the Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. § 1962(c) (conducting affairs of an enterprise through a pattern of racketeering activity) and (d) (conspiracy to violate RICO § 1962(c)). Compl. ¶¶ 4.1-4.8; Am. Compl. ¶ 6.1. To that end, Plaintiffs allege that these defendants are guilty of (1) extortion or attempted extortion in violation of N.C. Gen. Stat. § 14-118.4, (2) extortion or attempted extortion in violation of 18 U.S.C. § 1951, (3) conspiracy to commit extortion in violation of 18 U.S.C. § 1962(c), and (4) obstruction of justice. In Count Two, Plaintiffs bring a claim pursuant to 42 U.S.C. § 1981 alleging Agingu, Klah, Alston, Thompson, Jones, Person and Pace intentionally interfered with Plaintiffs' "right to make an (sic) enforce a contract in the same manner generally permitted non-minority citizens." Compl. ¶¶ 4.9-4.13; Am. Compl. ¶¶ 6.2, 6.4. Plaintiffs also bring a claim against Agingu, Klah, Alston, Thompson, Jones, Person and Pace under 42 U.S.C. §1983 for deprivation of equal protection and substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution. Compl. ¶¶ 3.24, 4.9-4.13; Am. Compl. ¶¶ 6.2, 6.4. Counts three through six assert claims, naming some or all of the defendants, purportedly arising under state law for breach of contract, defamation, intentional infliction of emotional distress and

4

violation of Executive Order 13 of the Governor of North Carolina. Compl. ¶¶ 4.14-4.17; Am. Compl. ¶¶ 6.3, 6.5.

A. NCSE Consumer Referrals

On 24 September 2008, NCSE was approved by the Division to be a vendor for supported employment programs.[7] Ex. A-2 at 2 [DE-3.3]. In order to activate its "vendorship," NCSE executed a Memorandum of Agreement ("MOA") with the Division. Ex. A-2 at 2 [DE-3.3]. As a vendor, NCSE was responsible for "providing supported employment services, evaluation-work adjustment services and/or community based assessment for consumers [referred by the Division] to assist in their efforts in returning to employment." Ex. A-2 at 4 [DE-3.3].

On 27 October 2008, approximately one month after the activation of NCSE's vendorship, Nicholson emailed Billy Cupit ("Cupit"), Regional Community Rehabilitation Specialist with the Division, advising him that the Division had not referred any consumers to NCSE. Compl. ¶ 3.3; Ex. A-2 at 2 [DE-3.3]; Ex. A-5 at 2 [DE-5.6]. In addition, an employee of Community Workforce Solutions, Inc. ("CWS"), a provider of similar employment services, told Nicholson that CWS had

---

[7] The North Carolina Administrative Code ("the Code") defines "supported employment program" as

> a service that provides periodic support services for individuals 16 years of age or older with developmental disability, mental illness or substance abuse disorders to prepare the individual to work as independently as possible. The service is typically planned and implemented in cooperation with the Division of Vocational Rehabilitation Services.

10A N.C.A.C. 27G.5801 (2010). A business operating in this capacity is classified as a community rehabilitation program ("CRP"), defined as a program that provides directly or facilitates the provision of . . . vocational rehabilitation services [including job development and placement] to individuals with disabilities to enable those individuals to maximize their opportunities for employment . . . ." 10A N.C.A.C. 89D.0204(a)(1)(I); *see* Compl. ¶ 3.26.

5

received referrals from the Division and had a waiting list of consumers seeking job placement. Compl. ¶ 3.5. Cupit advised Nicholson to discuss her concerns with Agingu, the local unit manager and head of the Henderson Office. Ex. A-5 at 2 [DE-5.6]; Compl. ¶ 3.1. On or about 30 October 2008, Nicholson contacted Agingu who berated Nicholson for calling Cupit and not following the chain of command. Compl. ¶ 3.6. Agingu further noted that the decision to refer consumers to NCSE was Agingu's alone. *Id.* ¶¶ 3.8-3.13. Agingu suggested Nicholson locate available jobs because Division counselors might then be more willing to refer consumers to NCSE. *Id.* ¶ 3.14. Both Cupit and Davis advised Plaintiffs that state policy and regulations gave Agingu the sole authority over the referral process and suggested Plaintiffs "kiss up" to Agingu by identifying job prospects despite the lack of referrals. *Id.* ¶¶ 3.17-3.22. Nevertheless, on 5 November 2008, Alston provided NCSE two consumer referrals. *Id.* ¶ 3.26. Upon training the referred consumers, Alston notified Nicholson that Agingu authorized payment for only a portion of the training services provided by NCSE. *Id.* ¶¶ 3.26-3.27; Ex. A-6 [DE-5.7 at 2-3].

In mid-November 2008, Klah notified Nicholson that five consumer referrals were forthcoming. Compl. ¶ 3.30. Several weeks later, however, Klah informed Nicholson that Agingu sent the referrals to CWS instead. Compl. ¶ 3.31. In mid-December 2008, Nicholson and Pitts met with Agingu to discuss the status of outstanding invoices and the lack of referrals. *Id.* ¶ 3.32. Agingu accused Plaintiffs of unprofessional conduct and informed Plaintiffs of reports he had received that NSCE staff were harassing Division counselors. *Id.* ¶ 3.39. Agingu threatened to suspend NCSE's vendorship. *Id.* ¶ 3.40. Plaintiffs allege further that Agingu encouraged counselors not to refer business to NCSE and excluded NCSE from Division staff meetings which CWS was allowed to attend. *Id.* ¶ 3.45, at 13 n.47. Sometime after December 2008, Agingu took a leave of

6

absence from the Henderson Office and during his absence, NCSE received approximately thirteen consumer referrals. *Id.* ¶ 3.47.

B. Invoice Payments

On 8 April 2009, Plaintiffs submitted invoices to the Division for payment for services performed by NCSE during the months of February and March 2009; however, the Division did not provide payments until 25 June 2009. *Id.* ¶ 3.54. On 10 June 2009, Plaintiffs submitted a second set of invoices corresponding to services performed during April and May 2009. *Id.* ¶ 3.56. NCSE received payment for the April and May 2009 invoices on 14 September 2009; however, the payment was $457.92 less than the invoiced amount. *Id.* ¶¶ 3.57-3.58, 3.63.

On 24 July 2009, Plaintiffs submitted a third set of invoices for services performed in June and July 2009. *Id.* ¶ 3.59. Despite assurances from Jones and Thompson that the invoices had been submitted to the Division for processing, on 18 September 2009, Thompson admitted the invoices had not been submitted due to improper invoicing. *Id.* ¶¶ 3.57, 3.59, 3.61, 3.65-3.70. On 25 September 2009, Nicholson received a letter from Thompson indicating that the July invoice had been paid. *Id.* ¶ 3.81. However, on 2 October 2009, Jones informed Nicholson that the invoice had in fact been misplaced and thus had not been submitted for processing. *Id.* ¶¶ 3.81, 3.83. On 9 October 2009, Cupit conducted a review of NCSE with John Harper ("Harper"), a Division employee. *Id.* ¶¶ 3.10, 3.85. Harper informed Plaintiffs of complaints by Thompson regarding Plaintiffs' documentation of services on their invoices. *Id.* ¶ 3.86. Plaintiffs expressed their belief that Thompson's complaints were made as an excuse for Thompson's own failure to properly submit the invoices for processing. *Id.* ¶ 3.86. At the conclusion of the meeting, neither Cupit nor Harper requested any modifications to Plaintiffs' invoice practices. *Id.* ¶ 3.86. On 13 November 2009, the

7

July invoice was submitted for processing and the payment was received on 27 November 2009; however, the payment was $127.98 less than the amount billed by Plaintiffs.[8] *Id.* ¶¶ 3.81-3.82.

On 4 December 2009, Alston and Klah met with Nicholson and warned her that Agingu had expressed concern that the Henderson Office would "go out of business because of NCSE," that counselors with the Henderson Office complained about Nicholson's unprofessional conduct during "every staff meeting," and that Plaintiffs should cease complaining about Thompson's handling of Plaintiffs' invoices. *Id.* ¶¶ 3.90-3.91, 3.95. Plaintiffs were warned further that NCSE would not survive financially without consumer referrals from the Division. *Id.* ¶ 3.95. Furthermore, Klah warned Nicholson that "NCSE's payments could easily get lost in her mail box or just on her deck [sic]." *Id.* ¶ 3.96.

Klah returned Plaintiffs' September and October invoices and instructed Plaintiffs to edit the documentation of the services provided by NCSE.[9] *Id.* ¶ 3.100. Klah explained the invoice revisions were necessary because NCSE's documentation indicated that Klah had failed to properly perform her job duties.[10] *Id.* ¶ 3.103. Alston advised Plaintiffs to have "five or six" consumers simultaneously watch a two-hour employment video and that NCSE should bill two hours for each

---

[8] Despite acknowledging partial payment of the July 2009 invoice, Plaintiffs allege that as of the date of the complaint, the June and July 2009 invoices have not been submitted to the Division for payment. Compl. at 16 n.57. Plaintiffs do not discuss these invoices in their amended complaint.

[9] In submitting invoices to a Division office, Plaintiffs are required to include a billing narrative and case notes regarding each consumer. *Id.* ¶¶ 3.67, 3.71, 3.86. In completing a narrative, a vendor is required to use a form provided by the Division; however, despite repeated requests, Plaintiffs were never provided this form. *Id.* at 17 n.60.

[10] According to Plaintiffs, Klah informed Plaintiffs that one of the narratives included a statement about a particular consumer's homelessness and that such information indicated Klah's failure to perform required work duties. Compl. ¶ 3.103. Klah therefore demanded Plaintiffs delete the information regarding the consumer's homelessness status. *Id.* ¶ 3.104.

8

consumer. *Id.* ¶ 3.107. Plaintiffs informed Alston that such billing practices were fraudulent but Alston and Klah explained counselors do not review each others notes and therefore "nobody would know the difference." *Id.* ¶¶ 3.108-3.109. At the conclusion of the meeting, Klah told Pitts that "as long as you have this, referring to his skin color, they are always going to believe you don't know what you are doing." Compl. ¶ 3.110.

In early December 2009, Plaintiffs sought the assistance of North Carolina State Senator Douglas Berger, who referred the matter to his legislative assistant Brice Bratcher ("Bratcher"). *Id.* ¶ 3.111. Upon Bratcher's request, Plaintiffs provided a memo outlining alleged federal and state law violations committed by defendants. *Id.* ¶ 3.112. Sharnice Ranson, the legislative liaison for the Division, received a copy of the memo and forwarded it to the Division's Regional Director. *Id.* ¶ 3.113. The Regional Director ordered Cupit to conduct an investigation. *Id.* ¶ 3.113.

On 17 December 2009, a meeting occurred at the offices of NCSE between Cupit, Demetria Harper ("Ms. Harper") and Plaintiffs. *Id.* ¶ 3.114. Cupit instructed Ms. Harper to review the documentation accompanying the September and October 2009 invoices. *Id.* ¶ 3.117.[11] Cupit advised Plaintiffs that he would personally deliver the invoices to the Division for expedited payment. *Id.* On 22 December 2009, Ms. Harper emailed Nicholson, advising her that after "carefully reviewing the case service invoices there are some questions and some things needing some clarification." *Id.* ¶ 3.118; Ex. A-13 at 2 [DE-5.14]. On 28 December 2009, Klah informed Nicholson that NCSE's existing cases were on hold.[12] Compl. ¶¶ 3.120-3.121; Ex. A-23 at 2 [DE-

---

[11] Plaintiffs misnumber paragraphs 3.115 through 3.121 as 3.15 through 3.21. *See* Compl. at 23. The court cites these paragraphs as intended by Plaintiffs.

[12] Klah explained one case was closed pursuant to the request of a consumer ("TM"). Compl. ¶ 3.125; Ex. A-23 at 2 [DE-5.24]. Plaintiffs claim TM denies requesting the closure of his case.

9

5.24].

On 10 January 2010, a second meeting between Plaintiffs and Division employees, including Cupit, Nicholson and Agingu, was held at NCSE. Compl. ¶ 3.141. Cupit instituted a new process to improve communications between Plaintiffs and the Division counselors and to resolve billing disputes. *Id.* ¶ 3.145. On 14 January 2010, Nicholson met with Agingu and Klah at the Henderson Office to discuss the status of four pending invoices whereupon Klah returned an August 2009 invoice, in addition to the September and October 2009 invoices, with documentation explaining why the invoices were not approved for payment - explanations Nicholson contends are contrary to the state rehabilitation services plan and public policy. *Id.* ¶¶ 3.147-3.148. On 19 February 2010, Nicholson attended the Henderson Office's monthly staff meeting. *Id.* ¶ 3.152. Nicholson was advised that the outstanding invoices were "in proper order." *Id.* ¶ 3.152. That same day, Nicholson received payment for services rendered in August 2009; however, the payment received was $549.12 less than the amount billed by NCSE. *Id.* ¶ 3.153. Plaintiffs contend the reduced payment was the result of Klah's amendment or reproduction of the original invoice and time sheet signed by Nicholson. *Id.* ¶ 3.153.

Subsequent to the February meeting, Klah reminded Nicholson of an earlier conversation

Compl. ¶ 3.126. Plaintiffs claim further that Klah refused to pay for services rendered in August 2009 by NCSE in developing a business plan for TM which was authorized by Klah. Compl. ¶ 3.129; Ex. A-14 at 2-11 [DE-5.15].

Plaintiffs allege Klah's sudden dismissal of NCSE's caseload was an act of retaliation and redressable under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9610, and the whistleblower protection provision of the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. § 660. Compl. ¶ 3.123. CERCLA addresses liability due to environmental contamination from hazardous material. *See* 42 U.S.C. § 9607. Plaintiffs have alleged no facts indicating CERCLA applies to this case. Further, Plaintiffs have not alleged discrimination as a result of exercising any right afforded by the OSHA.

10

wherein Nicholson was told that NCSE would not receive payment for services rendered to a particular consumer, identified in the complaint as "MC," during November and December 2009. *Id.* ¶ 3.157. Plaintiffs contend, however, that Klah did not advise of this decision until 28 December 2009. *Id.* ¶ 3.158; Ex. A-23 at 2 [DE-5.24]. Accordingly, on 18 March 2010, Nicholson requested "Klah pay outstanding invoices, pay [the] $549.12 portion of the invoice improperly deleted from August 2009 payment and allow NCSE to submit November and December 2009 [invoices] for services rendered on behalf of MC." Compl. ¶ 3.167.

On 14 April 2010, Cupit conducted the Division's third review of NCSE, attended by Agingu, Bonnie Bettini ("Bettini"), Nicholson and Pitts. During the meeting, Bettini, a Division counselor, acknowledged alterations of an NCSE invoice and time sheet documenting services provided in August 2009.[13] Am. Compl. ¶ 5.2 and at 8 n.12. Bettini stated further, and Pace later confirmed, that a check in the amount of $549.12, the amount missing from Plaintiffs' August 2009 payment, had recently been submitted for processing. *Id.* ¶¶ 5.3-5.5. As of the date of the filing of the amended complaint, Plaintiffs have not received the $549.12 payment. *Id.* ¶¶ 5.6, 5.9.

During the April 2010 program review, the Division and NCSE agreed that any past billing should be resubmitted to the Division for payment. *Id.* ¶ 5.10. Plaintiffs thus far have submitted ten of the thirty-three monthly invoices for which Plaintiffs seek payment totaling approximately $8,000.00. *Id.* ¶¶ 5.11-5.12. Despite this agreement, however, Bettini subsequently notified Plaintiffs that NCSE would receive payment totaling $2,042.04 only. *Id.* ¶ 5.13. Plaintiffs state that during the meeting, Agingu and Bettini admitted to "a lack of familiarity with the [] [North Carolina]

---

[13] According to Plaintiffs, Pace later admitted to making the alterations at Klah's request. Am. Compl. at 8 n.14. The altered invoice was for $1,235.52, which did not conform to any billing made by Plaintiffs. *Id.* ¶¶ 5.28, 5.53.

11

administrative code and its regulations, rules, standards as well as the State Plan governing CRPs and the supported employment model in general." *Id.* ¶ 5.19. The meeting concluded with the Division and Plaintiffs agreeing to resume monthly meetings. *Id.* ¶ 5.24.

On 14 May 2010, Plaintiffs met with Division staff, including Pace, Person, Bettini, Klah and Agingu. *Id.* ¶ 5.27. Plaintiffs requested, and Pace agreed to provide, "copies of the altered invoice and time sheet which a check for $1,235.52 was paid from on February 15, 2010" and "the time sheet created by [the Division] to pay the invoice and authorization for a pending payment of $549.12." *Id.* ¶¶ 5.28-5.29. However, the only document provided Plaintiffs was a time sheet dated August 2009, allegedly signed by Nicholson, which represented a billing amount that did not match any invoice or time sheet submitted by Plaintiffs.[14] *Id.* ¶¶ 5.53-5.54. Person then accused Plaintiffs of creating a forged document regarding a consumer, referred to in the amended complaint as "TO," and disputed that the Division had authorized NCSE to perform services on behalf of TO. *Id.* ¶¶ 5.30-5.31. Klah further accused Plaintiffs of harassing a consumer referred to as "CM." *Id.* ¶ 5.42.

During the same meeting, Agingu asked Plaintiffs to submit a written statement acknowledging Plaintiffs failure to timely submit invoices and case notes, despite facts to the contrary. *Id.* ¶¶ 5.48, 5.51. Agingu also agreed to submit numerous payments owed NCSE for processing. *Id.* ¶ 5.52. On 18 July 2010, Plaintiffs received a letter from Agingu dated 24 June 2010 and postmarked 14 July 2010 indicating his refusal to pay past invoices. [DE-11 at 9 n.19].

### III. STANDARD OF REVIEW

The court must dismiss a case brought *in forma pauperis* if the court determines that the

---

[14] Plaintiffs contend Division personnel, including Pace, Jones, Thompson and Klah, altered official, signed documents submitted by Plaintiffs on behalf of NCSE and have "reproduced" Nicholson's signature on at least four of these documents. Am. Compl. ¶¶ 5.56-5.57.

action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks money damages from a defendant immune from such recovery. 28 U.S.C. § 1915(e)(2)(B)(i-iii); *see Denton v. Hernandez*, 504 U.S. 25, 28 (1992); *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994) (explaining Congress enacted predecessor statute 28 U.S.C. § 1915(d) "to prevent abuse of the judicial system by parties who bear none of the ordinary financial disincentives to filing meritless claims"). A complaint is frivolous "where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). The court may not dismiss a claim as frivolous merely because the supporting allegations seem unlikely to have occurred. *Denton*, 504 U.S. at 33. The failure to state a claim standard is the familiar standard under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Lugo v. INS*, 950 F. Supp. 743, 745 (E.D. Va. 1997).

Although pleadings of *pro se* plaintiffs are held to "less stringent standards" than those drafted by attorneys, *White v. White*, 886 F.2d 721, 722-23 (4th Cir. 1989), the court is not required to accept a *pro se* plaintiff's contentions as true. *Denton*, 504 U.S. at 32. Instead, the court is permitted to "pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Neitzke*, 490 U.S. at 327. Such baseless claims include those that describe "fantastic or delusional scenarios." *Id*. at 328. Provided that plaintiff's claims are not clearly baseless, the court must weigh plaintiff's factual allegations in his favor in its frivolity analysis. *Denton*, 504 U.S. at 32 (explaining under predecessor statute 28 U.S.C. § 1915(d) that "a court is not bound, as it usually is when making a determination based solely on the pleadings, to accept without question the truth of the plaintiff's allegations"). The court must read the complaint carefully to determine if plaintiff has alleged specific facts sufficient to support his claims. *White*, 886 F.2d at 724. Notwithstanding the court's obligation to liberally construe plaintiff's allegations,

13

however, the court cannot ignore a clear failure to allege facts which set forth a claim cognizable in a federal district court. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990). ("The 'special judicial solicitude' with which a district court should view such *pro se* complaints does not transform the court into an advocate. Only those questions which are squarely presented to a court may properly be addressed.").

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading that states a claim for relief must contain "a short and plain statement of the grounds for the court's jurisdiction. . . [and] a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(1)-(2). The statement must provide fair notice of what the claim is and the grounds upon which it rests. *Ashcroft v. Iqbal*, __ U.S.__, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Todd v. Geneva Convention*, No. 3:08-660-MBS, 2008 WL 1339835, at *6 (D.S.C. Apr. 9, 2008) (holding in review for frivolity, a plaintiff must offer more detail than simply listing conclusory legal terms in order to support a claim). A plaintiff fails to state a claim upon which relief may be granted when a complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

As part of its review, a court may consider whether it has subject matter jurisdiction of the case. *See Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999) (holding that "[d]etermining the question of subject matter jurisdiction at the outset of the litigation is often the most efficient procedure"); *Wright v. Huggins*, No. 5:09-CV-551-D, 2010 U.S. Dist. LEXIS 50264, at *6, 2010 WL

14

2038806, at *2-3 (E.D.N.C. Mar. 11, 2010) (dismissing complaint on basis of lack of subject matter jurisdiction as part of court's frivolity review under 28 U.S.C. § 1915) (citations omitted). "Federal courts are courts of limited jurisdiction and are empowered to act only in those specific situations authorized by Congress." *Bowman v. White*, 388 F.2d 756, 760 (4th Cir. 1968). The presumption is that a federal court lacks jurisdiction in a particular case unless it is demonstrated that jurisdiction exists. *Lehigh Min. & Mfg. Co. v. Kelly*, 160 U.S. 327, 337 (1895). The burden of establishing subject matter jurisdiction rests on the party invoking the jurisdiction of the court, here Plaintiffs. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). The complaint must affirmatively allege the grounds for jurisdiction. *Bowman*, 388 F.2d at 760. If the court determines that it lacks subject matter jurisdiction, the court must dismiss the action. FED. R. CIV. P. 12(h)(3).

Finally, in evaluating a complaint, a court may anticipate those affirmative defenses which are clear on the face of the complaint. *Todd v. Baskerville*, 712 F.2d 70, 74 (4th Cir. 1983); *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 954 (4th Cir. 1995) (en banc) (court may apply common sense and reject fantastic allegations and/or rebut them with judicially noticed facts).

## IV. IMMUNITY UNDER THE ELEVENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

The court must first consider whether any defendant is immune from suit based on the Eleventh Amendment to the United States Constitution with respect to claims asserted by Plaintiffs. To the extent Plaintiffs' claims are not barred by the Eleventh Amendment, the court must then consider whether Plaintiffs' causes of action state claims upon which relief may be granted under 28 U.S.C. § 1915.

15

## A. Plaintiffs' Claims Against the North Carolina Agencies

Plaintiffs bring claims against DHHS and the Division for breach of contract and violation of Executive Order 13 of the Governor of North Carolina. Compl. ¶¶ 4.14, 4.17. According to the Supreme Court, "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001). This constitutional guarantee applies not only in suits against the State itself but also to suits where "one of [the State's] agencies or departments is named as the defendant." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). Thus, absent state consent, Eleventh Amendment immunity bars federal courts from considering pendent claims involving alleged violations of state law by state agencies. *See id.* The jurisdictional bar imposed by the Eleventh Amendment applies regardless of the nature of the relief sought. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146 (1993) (explaining "suits against the States and their agencies [] are barred regardless of the relief sought"); *Papasan v. Allain,* 478 U.S. 265, 276 (1986) (explaining "[t]his bar exists whether the relief sought is legal or equitable"); *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (holding that Eleventh Amendment bars claims for equitable relief against a state agency).

Here, there is no indication that the state of North Carolina has waived its sovereign immunity with respect to Plaintiffs' state law claims. *See e.g., Hooper v. North Carolina,* 379 F. Supp. 2d 804, 812 (M.D.N.C. 2005) (noting the state is protected from plaintiff's breach of contract by the Eleventh Amendment). Therefore, the state law claims against DHHS and the Division are barred in their entirety by Eleventh Amendment immunity. *See Ji Da Dai v. Univ. of N.C.,* No. 1:02CV224, 2003 U.S. Dist. LEXIS 15880, at \*29 n.8, 2003 WL 22113444, at \*9 n.8 (M.D.N.C.

Sept. 2, 2003) (explaining plaintiff's "state common law claims [] are barred from consideration in federal court by the State's Eleventh Amendment immunity"). Accordingly, the court recommends Plaintiff's claims for breach of contract and violation of Executive Order 13 of the Governor of North Carolina be DISMISSED.

## B. Plaintiffs' Claims Against the Defendants in their Official Capacities

Plaintiffs have sued DHHS employees, Davis, Thompson, Jones, Alston, Klah, Agingu, Person and Pace, in their official capacities. Thompson, Jones, Alston, Klah, Agingu, Person and Pace are named in some or all of Plaintiffs' federal and state claims, while Davis is named only in Plaintiffs' breach of contract claim. Plaintiffs provide a general demand for damages wherein Plaintiffs seek the cost of this action, general, special punitive and treble damages, a preliminary injunction, restraining order and declaratory judgment.

At the outset, the court recommends DISMISSAL of Plaintiffs' state law claims against the DHHS employees in their official capacities on the grounds that North Carolina is immune from suit under the Eleventh Amendment. *See Pennhurst*, 465 U.S. at 101-102 (explaining "as when the State itself is named as the defendant, a suit against state officials [] is in fact a suit against a State [and] is barred regardless of whether it seeks damages or injunctive relief") (citation omitted). As the Supreme Court explained, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* at 106; *see also Szabo v. E. Carolina Univ.*, No. 4:07-CV-10-BO, 2007 U.S. Dist. LEXIS 56468, at *6, 2007 WL 2226006, at *2 (E.D.N.C. Aug. 2, 2007) (noting "[t]he Eleventh Amendment protects states by prohibiting federal courts from considering state law claims against state

officials"); *Int'l Acad. of Oral Med. & Toxicology v. N.C. Bd. of Dental Exam'rs*, No. 5:05-CV-856-D2, 2006 U.S. Dist. LEXIS 67103, at *7 (E.D.N.C. May 31, 2006) (stating "[t]he Fourth Circuit repeatedly has relied on *Pennhurst* to bar state law claims for injunctive relief against state officials in federal court").

As to Plaintiffs' federal claims for violations of RICO and 42 U.S.C. §§ 1981, 1983, the Eleventh Amendment bars Plaintiffs claims for retrospective relief against Thompson, Jones, Alston, Klah, Agingu, Person and Pace in their official capacities. *See Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 604 (1983) ("[I]n the Eleventh Amendment context . . . the relief cannot include a monetary award for past wrongs, even if the award is in the form of 'equitable restitution' instead of damages."); *Montgomery v. Maryland*, 266 F.3d 334, 340 (4th Cir. 2001), *vacated on other grounds by* 535 U.S. 1075 (2002) ("Whether the claim be legal or equitable in nature, a private plaintiff cannot receive retrospective relief from state officers sued in their official capacities."). Accordingly, this court recommends DISMISSAL of Plaintiffs' federal claims for costs and monetary damages against the individual defendants sued in their official capacities.

As to Plaintiffs' federal claims for prospective relief against these defendants, the Eleventh Amendment does not prohibit suits for prospective injunctive relief against state officials acting in violation federal law. *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Accordingly, the *Ex Parte Young* exception precludes outright dismissal of Plaintiffs' declaratory and injunctive claims for violations of RICO[15] and sections 1981 and 1983[16] on Eleventh

---

[15] Courts applying the *Ex parte Young* exception must hesitate before casting aside state officials' Eleventh Amendment immunity where Congress has prescribed a detailed remedial scheme for the enforcement of a statutorily created right. *See Seminole Tribe v. Fla.*, 517 U.S. 44, 74 (1996). Here, the court assumes, without deciding, that federal court jurisdiction under the *Ex Parte Young* exception is not precluded with respect to Plaintiffs' RICO claim. While the court has not identified

Amendment immunity grounds. *See Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998) ("[U]nder the *Ex parte Young* exception, which is based upon the recognized fiction that the officials' conduct is not that of the state, 'a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law.'") (quotation omitted). As discussed in Section V below, however, Plaintiffs have failed to state a claim for injunctive relief arising under federal law.

## C. Plaintiffs' Claims Against the Defendants in their Individual Capacities

Plaintiffs have also sued Thompson, Jones, Alston, Klah, Agingu, Person and Pace in their

---

caselaw holding that an injunction against state officials in their official capacities under the *Ex parte Young* exception is available under RICO, it does not appear that Plaintiffs are attempting to enforce a federal right under *Ex parte Young* that would provide them a wider range of remedies than Congress intended under RICO. *See Swartz v. Beach*, 229 F. Supp. 2d 1239, 1254 (D. Wyo. 2002). ("If a statutory scheme does not limit the role or power of the federal district court, then jurisdiction under the *Ex parte Young* doctrine is not precluded."). Title 18 U.S.C. § 1964, the civil remedies provision under RICO, provides in part:

> The district courts . . . shall have jurisdiction to prevent and restrain violations of section 1962 . . . by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest . . . in any enterprise; imposing reasonable restrictions on the future activities or investments of any person . . .
> Any person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C. § 1964(a),(c). There is no indication that Congress intended to limit or bar remedies generally available to an aggrieved party. Thus, to the extent Plaintiffs seek injunctive relief with respect to their RICO claim, such relief is arguably in accordance with RICO's own provisions which allows private citizens to pursue civil suits to enforce the statute. *See* 18 U.S.C. § 1962.

[16] It is well settled that the *Ex parte Young* exception applies to state official defendants sued under section 1981 and 1983. *See Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1197-98 (10th Cir. 1998) (noting a court need not consider whether Congress prescribed in § 1983 a detailed remedial scheme because it does not create substantive rights and explaining section 1981 does not provide a detailed remedial scheme from which judicial variance would be improper).

19

individual capacities for violations of federal and state law.[17] The Supreme Court has held that the Eleventh Amendment does not bar suits in federal court seeking to impose personal liability on individual state officials. *Scheuer v. Rhodes*, 416 U.S. 232, 238 (1974). Nonetheless, the Supreme Court recognizes "qualified immunity" in suits for civil damages based on the actions of government officials that do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Hinton v. Holding*, 5:07-CT-3057-D, 2008 U.S. Dist. LEXIS 46153, at *9, 2008 WL 2414042, at *3 (E.D.N.C. June 12, 2008) (explaining "[i]n conducting a frivolity review [under § 1915], a court may consider the defense of qualified immunity") (*citing Jones v. Bock*, 549 U.S. 199 (2007)). To determine whether each defendant is entitled to qualified immunity, the court "must (1) identify the right allegedly violated, (2) consider whether at the time of the alleged violation the right was clearly established, and (3) determine whether a reasonable person in [the defendant's] position would have known that his actions would violate that right." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004); *see also Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995) ("Where the law is clearly established, and where no reasonable [official] could believe he was acting in accordance with it, qualified immunity will not attach.").

A right is clearly established if "'its contours [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right.'" *Smith v. McCarthy*, 349 Fed. Appx. 851, 858 (4th Cir. 2009) (alterations added) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). That is, whether the state of the law at the time of the lawsuit gave the government officials

---

[17] Plaintiffs do not name Davis as a defendant sued in his individual capacity. Compl. ¶ 1.7.

"fair warning" that their alleged treatment of the plaintiff was in violation of his constitutional or statutory rights. *Hope*, 536 U.S. at 741. A general statement of the law, such as in a criminal statute, is capable of giving government officials the requisite "fair warning." *Id.* There is no question that protections afforded individuals under RICO, section 1981 and section 1983 are clearly established. *See Busby v. Crown Supply*, 896 F.2d 833, 838 (4th Cir. 1990) (noting RICO was enacted in 1970); *Demuren v. Old Dominion Univ.*, 33 F. Supp. 2d 469, 475 (E.D. Va. 1999) (noting "protections [from discrimination] afforded individuals under 42 U.S.C. § 1981 and § 1983 are clearly established"). Since it is not apparent from the face of the complaint that qualified immunity applies to bar suit against Thompson, Jones, Alston, Klah, Agingu, Person and Pace in their individual capacities, the court considers the federal causes of action alleged against these defendants in Section V below. *See Todd*, 712 F.2d at 74 (explaining in its frivolity review, a court may consider those defenses which are clear on the face of the complaint).

## V. PLAINTIFFS' CAUSES OF ACTION

### A. RICO Claim

Plaintiffs allege a civil RICO claim under 18 U.S.C. § 1962(c) and (d) against defendants Agingu, Klah, Alston, Thompson and Person in their individual and official capacities. Section 1962(c) makes it a crime for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . " and section 1962(d) makes it a crime for any person to conspire to violate section 1962(c). To that end, Plaintiffs allege that each defendant has committed illegal acts of: (1) extortion or attempted extortion in violation of N.C. Gen. Stat. § 14-118.4; (2) extortion or attempted extortion in violation

21

of 18 U.S.C. § 1951; (3) conspiracy to commit extortion in violation of 18 U.S.C. § 1962(c); and (4) obstruction of justice. Compl. ¶¶ 4.1-4.8; Am. Compl. ¶ 6.1.

RICO "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *US Airline Pilots Ass'n v. AWAPPA, LLC*, __ F.3d ___, 2010 U.S. App. LEXIS 15781, at *7, 2010 WL 2979322, at *3 (4th Cir. July 30, 2010) (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)). The penalties authorized under RICO have been described as "drastic," and serve to underscore that RICO is "primarily designed to provide society with a powerful response to the dangers of organized crime." *US Airline Pilots Ass'n.*, 2010 U.S. App. LEXIS 15781, at *7-8, 2010 WL 2979322, at *3 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233, 245 (1989)). As the Fourth Circuit has recently emphasized, courts

> must exercise caution to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted.

*Id.* (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989)).

To state a civil RICO claim under section 1962(c), a plaintiff must allege (1) a person, (2) an enterprise, and (3) a pattern (4) of racketeering activity (5) that causes injury to the plaintiffs. *Williams v. Equity Holding Corp.*, 498 F. Supp. 2d 831, 840 (E.D. Va. 2007); *see also Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985) (explaining "[a] violation of § 1962(c) . . . requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" and "a plaintiff must also plead he was injured in his business or property by reason of the RICO violation) (footnote omitted).

1. Person and Enterprise

To establish liability under § 1962(c), a plaintiff must allege the existence of two distinct entities: (1) a "person" and (2) an "enterprise" that is not simply the same "person" referred to by a different name.[18] *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). This "distinctiveness" requirement is satisfied where the alleged "person" is a corporate owner or employee of the alleged "enterprise." *Barefoot v. Sec. Credit Corp.*, No. 5:08-CV-00018-BO, 2008 U.S. Dist. LEXIS 92319, at *8, 2008 WL 4889334, at *3 (E.D.N.C. Nov. 12, 2008) (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)). Here, through the allegations, Plaintiffs identify the Henderson Office as the enterprise and defendants Agingu, Klah, Alston, Thompson, Person and Branch,[19] all of whom are employees of the enterprise, as the persons who participated in the RICO enterprise. Compl. ¶¶ 1.6, 4.1-4.7; Am. Compl. ¶ 6.1. Accordingly, Plaintiffs have properly allegedly the RICO "person" and "enterprise" in their complaint. *See Cedric Kushner Promotions, Ltd.*, 533 U.S. at 163 ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the [RICO] statute that requires more "separateness" than that.").

2. Predicate Act of Racketeering

Under RICO, racketeering activity is defined as any act "chargeable" or "indictable" under

---

[18] Under RICO, "person" includes any individual or entity capable of holding a legal or beneficial interest in property and "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961 (3)-(4).

[19] While Plaintiffs identify Branch as a "person" in the factual allegations of their complaint, Plaintiffs do not identify Branch within the RICO count. Compl. ¶ 1.6.

a number of enumerated state and federal statutes (i.e., "predicate" acts or offenses), including the crime of extortion (or attempted extortion) under N.C. Gen. Stat. § 14-118.4 or the Hobbs Act (interference with commerce by threats or violence, 18 U.S.C. § 1951), as alleged in the case at bar. *See* 18 U.S.C. 1961(1)(A)-(B). Section 14-118.4 of the North Carolina General Statutes provides that "[a]ny person who threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or immunity is guilty of extortion . . . ." Thus, there are two elements to extortion under North Carolina law: (1) the defendant communicated a threat; and (2) he did so with the intent to wrongfully obtain something of value. *Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union*, 585 F. Supp. 2d 789, 799 (E.D. Va. 2008) (citing *State v. Greenspan*, 92 N.C. App. 563, 566, 374 S.E.2d 884 (1989)). The Hobbs Act criminalizes interference with interstate commerce by extortion, along with attempts or conspiracies to do so, 18 U.S.C. § 1951(a), with extortion defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2); *US Airline Pilots Ass'n.*, 2010 U.S. App. LEXIS 15781, at *8-9, 2010 WL 2979322, at *3.

To sufficiently plead a violation of extortion under N.C. Gen. Stat. § 14-118.4 or 18 U.S.C. § 1951, a plaintiff must allege that defendant attempted to obtain the plaintiff's property, with plaintiff's consent, where such consent was induced by the wrongful use of actual or threatened force, violence or fear. *Barefoot*, 2008 U.S. Dist. LEXIS 92319, at *13, 2008 WL 4889334, at *5 (citing *Tryco Trucking Co. v. Belk Stores Servs., Inc.*, 634 F. Supp. 1327, 1334 (W.D.N.C. 1986)); *see also Smithfield Foods, Inc.*, 585 F. Supp. 2d at 798 (explaining "for a 'state extortion offense' to qualify as a predicate act under the federal RICO statute, the conduct must be capable of being generically

classified as extortionate: that is, 'obtaining something of value from another with his consent induced by the wrongful use of force, fear or threats'") (quoting *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409-10 (2003)) (emphasis omitted).

"Property" under the Hobbs Act is not limited only to physical or tangible property and includes any valuable right that is considered to be a source or element of wealth. *U.S. v. Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969). Accordingly, "property" encompasses the "right of [a corporation] to make a business decision free from outside pressure wrongfully imposed . . . . " *U.S. v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978); *accord Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union*, 633 F. Supp. 2d 214, 225 (E.D. Va. 2008) (explaining intangible rights of a business constitute property susceptible of extortion) (citations omitted).

The element of "obtaining" property requires a transfer of property from the plaintiff to the defendant. *Scheidler*, 537 U.S. at 404. Thus, even if a defendant interferes with a plaintiff's property rights, he cannot be held liable for extortion unless he receives something of value from the plaintiff. *Id.* at 404-05, 411 (holding "[b]ecause petitioners did not obtain or attempt to obtain respondents' property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed"); *see also United States v. Gotti*, 459 F.3d 296, 324 (2d Cir. 2006) (mere interference with right to conduct business, even to point of causing cessation of business, is closer to coercion than extortion); *Roman Restoration, Inc. v. Operative Plasterers' & Cement Masons' Int'l Ass'n of the United States*, No. 07-2991, 2008 U.S. Dist. LEXIS 49940, at \*9 (D.N.J. June 30, 2008) (holding plaintiff did not state a violation of the Hobbs Act where plaintiff failed to allege that defendant attempted to obtain plaintiff's property).

As for the "induced consent" element, a fear of economic loss or harm by Plaintiffs is

25

sufficient to sustain a Hobbs Act violation. *See United States v. Billups*, 692 F.2d 320, 330 (4th Cir. 1982). Moreover, this fear "'need not be the consequence of a direct or implicit threat by the defendant' so long as the 'circumstances surrounding the alleged extortionate conduct rendered that fear reasonable.'" *Barefoot*, 2008 U.S. Dist. LEXIS 92319, at *13, 2008 WL 4889334, at *5 (quoting *U.S. v. Billups*, 692 F.2d 320, 330 (4th Cir.1982)).

Here, viewing the allegations in a light favorable to Plaintiffs, Plaintiffs have satisfactorily alleged fear of economic harm as a result of defendants' conduct and actions: Defendants were the sole provider of consumer referrals to NCSE and allegedly threatened to stop sending business to NCSE. *See* Compl. ¶¶ 3.2, 3.8. However, Plaintiffs have failed to allege conduct that may be generally classified as extortionate. *See Smithfield Foods, Inc.*, 585 F. Supp. 2d at 798. In particular, Plaintiffs have failed to allege facts that the individually-named defendants attempted to obtain property from Plaintiffs and that this attempt was with Plaintiffs' consent. *See Scheidler*, 537 U.S. at 405 (explaining interfering with or depriving someone of property is insufficient to constitute extortion). Accordingly, the court recommends DISMISSAL of Plaintiffs' RICO claim against the individually-named defendants in their official and individual capacities.

3. Pattern of racketeering activity

Even assuming Plaintiffs had sufficiently pled a predicate act, Plaintiffs must sufficiently allege also a pattern of racketeering activity. The requisite "pattern of racketeering activity" must include "at least two [predicate] acts of racketeering activity . . . ." 18 U.S.C. § 1961(5). However, "two isolated acts of racketeering activity do not constitute a pattern." *Sedima*, 473 U.S. at 496 n. 14. Rather, "'it is the factor of *continuity plus relationship* which combines to produce a pattern.'" *Id.* (quoting S.Rep. No. 91-617, 91st Cong., 1st Sess. 158 (1969) (emphasis added)). The pattern

26

requirement is important because "[i]n providing a remedy of treble damages . . . Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences." *Menasco, Inc.*, 886 F.2d at 683. Again, RICO's remedies are not appropriate for "the ordinary run of commercial transactions." *Id.*; *see also Eplus Tech., Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir. 2002) (noting that the pattern requirement is "designed to prevent RICO's harsh sanctions . . . from being applied to garden-variety fraud schemes").

*i. Relationship*

Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)); *accord Menasco, Inc.*, 886 F.2d at 683. In the present case, the alleged state and federal extortion claims involve the same participants, victims and methods of commission. If the court had found that Plaintiff has sufficiently established predicate acts of racketeering, it is arguable that Plaintiffs have sufficiently demonstrated "relatedness."

*ii. Continuity*

As for the continuity requirement, it "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H. J. Inc.*, 492 U.S. 241. Closed-ended continuity may be established by "proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement. *Id.* Moreover, "where the RICO allegations concern only a *single scheme* with a *discrete goal*, the courts have refused to find a closed-ended pattern of

27

racketeering even when the scheme took place over longer periods of time." *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250 (11th Cir. 2004) (emphasis added) (collecting cases); *see also Menasco, Inc.*, 886 F.2d at 684 (finding plaintiffs' allegations failed to satisfy the continuity prong where the defendants' actions targeted one set of victims, were narrowly directed towards a single fraudulent goal and took place over approximately one year).

Here, the predicate acts are alleged to have occurred for a period of approximately fifteen months. *See* Compl. ¶¶ 3.3, 3.167. Even if this period of time was deemed sufficient, however, the pleadings present the predicate acts as part of a single scheme perpetrated by the Division and its employees against a single victim. *See Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (holding the fact that defendants' actions took place over a period of years cannot convert a single scheme perpetrated against a single victim into a pattern within the meaning of RICO). Plaintiffs' allegations do not describe a closed period of repeated conduct. *See Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1988), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) (explaining courts should consider several factors in deciding whether a pattern of racketeering has been shown including "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries"). Accordingly, the complaint does not sufficiently allege closed-ended continuity.

Addressing whether Plaintiffs describe a pattern of racketeering under the open-ended concept, the court finds that Plaintiffs have not alleged activity threatening future repetition. Open-ended continuity may be sufficiently alleged where "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or "the predicate acts or offenses

28

are part of an ongoing entity's regular way of doing business." *H. J. Inc.*, 492 U.S. at 242. A plaintiff cannot demonstrate open-ended continuity if the alleged racketeering activity has a "built-in ending point and the case does not present the necessary threat of long-term, continual criminal activity." *US Airline Pilots Ass'n*, 2010 U.S. App. LEXIS 15781, at *11, 2010WL 2979322, at *4; *see also Menasco*, 886 F.2d at 684 (finding no continuity because "[d]efendants actions were narrowly tailored towards a single fraudulent goal"). There are no allegations here which would allow the court to conclude that defendants' acts of failing to refer consumers to NCSE or paying invoices in a timely fashion was a scheme which projects into the future with the threat of repetition or that the alleged offenses were part of the Henderson Office's regular way of doing business. *See H. J. Inc.*, 492 U.S. at 241; *see also US Airline Pilots Ass'n*, 2010 U.S. App. LEXIS 15781, at *16, 2010 WL 2979322, at *6 (finding no open-ended continuity where plaintiff failed to allege defendants' extortion campaign threatened indefinite repetition).

Plaintiffs have not alleged that defendants planned to continue their scheme indefinitely; rather, defendants' actions were allegedly focused solely on driving NCSE out of business. Compl. ¶ 3.95. Defendants' alleged objective therefore creates a foreseeable "built-in ending point that is closely related to the alleged extortion and thus precludes an open-ended continuity." *See US Airline Pilots Ass'n*, 2010 U.S. App. LEXIS 15781, at *13, 2010 WL 2979322 at *5 (citation omitted). While defendants' alleged extortion scheme may take a long time to come to fruition, it nonetheless has an ending point, the ultimate demise of NCSE, at which time defendants would cease their alleged extortion. *See id.* Given these allegations, it is apparent that this case does not present the sort of "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *See Menasco, Inc.*, 886 F.2d at 684. Moreover, considering the unity and narrow focus of

29

the alleged conduct, this case "does not resemble the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties." *Flip Mortgage Corp.*, 841 F.2d at 538 (citation omitted); *accord Al-Abood*, 217 F.3d at 238. Accordingly, this court recommends DISMISSAL of Plaintiffs' RICO claim against the individual defendants.

## B. Section 1981 Discrimination Claim

Plaintiffs allege that "while acting under color of state law, with an animus towards African Americans," Agingu, Klah, Alston, Thompson and Jones, Person and Pace in their individual and official capacities, violated Plaintiffs' "right to make an (sic) enforce a contract in the same manner generally permitted non-minority citizens . . . ." in violation of 42 U.S.C. § 1981. Compl. ¶¶ 1.8-1.12, 4.9-4.13; Am. Compl. ¶¶ 6.2, 6.4.

Section 1981 seeks to ensure that all citizens regardless of race have "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," including the right to make and enforce contracts. 42 U.S.C. § 1981; *see Moses v. Sears, Roebuck & Co.*, 545 F. Supp. 2d 550, 552 (W.D. Va. 2008) ("To establish a prima facie case under § 1981, plaintiff must show the defendant intended to discriminate on the basis of race, and the discrimination interfered with a contractual interest."). To the extent Plaintiffs seek to vindicate any independent rights for race discrimination under § 1981, however, they must do so via claims under section 1983, as section 1981 does not provide a cause of action against state actors. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) ("[T]he express action at law provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the

30

claim is pressed against a state actor") (citation omitted); *accord Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (holding § 1981 claims against county-state actor must be brought under § 1983); *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 543 (D. Md. 2008) (same).

  *Jett* has been interpreted to encompass not only governmental entities but also individuals sued in their individual capacities who are "state actors." *See Victors*, 553 F. Supp. 2d at 543 ("Even assuming that plaintiffs have sued [s]tate [d]efendants in their individual, rather than their official, capacities, the individual defendants are nonetheless state, not private, actors."); *see also Foster v. Md. State Police*, No. RDB-08-2505, 2010 U.S. Dist. LEXIS 4433, at *15, 2010 WL 311326, at *5 (D. Md. Jan. 20, 2010) (dismissing § 1981 claim against defendant sued in both his official and individual capacities); *Ebrahimi v. City of Huntsville Bd. of Educ.*, 905 F. Supp. 993, 996 (N.D. Ala. 1995) ("The Supreme Court did not make a distinction between state entities and individuals acting pursuant to color of state law."). To determine whether a person is a "state actor," a court must examine "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Victors*, 553 F. Supp. 2d at 543 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

  Here, Plaintiffs allege the individual defendants are employees of the Division, a North Carolina state agency, and violated Plaintiffs' rights "while acting under color of state law." *See* Compl. ¶¶ 4.9-4.13. As state actors, Agingu, Klah, Alston, Thompson, Jones, Person and Pace are not susceptible to suit under section 1981 in either their official or individual capacities. *See Victors*, 553 F. Supp. 2d at 543; *Foster*, 2010 U.S. Dist. LEXIS 4433, at *15, 2010 WL 311326, at *5. Rather, the only means for Plaintiffs to seek redress for rights protected by section 1981 against these defendants is through a section 1983 action. *See Davis v. Durham Mental Health Developmental*

31

*Disabilities Substance Abuse Area Auth.,* 320 F. Supp. 2d 378, 403 (M.D.N.C. 2004) (explaining "a § 1981 claim in effect merges with § 1983, and courts treat the claims as a single claim"); *accord Booker v. Bd. of Educ.,* 238 F. Supp. 2d 469, 475 (N.D.N.Y 2002) ("Where defendants to a lawsuit are state actors . . . [t]he § 1981 claim is treated exactly like the § 1983 claim, becomes merged into it and is considered as a single claim.") (citation omitted).

## C. Contractual, due process and equal protection claims under 42 U.S.C. § 1983

Plaintiffs assert claims under 42 U.S.C. § 1983 alleging defendants Agingu, Klah, Alston, Thompson, Jones, Person and Pace, in their individual and official capacities, deprived Plaintiffs of due process, equal protection and contractual rights based on Plaintiffs' race.[20] Compl. ¶¶ 1.8-1.12, 3.24, 4.9-4.13; Am. Compl. ¶¶ 6.2, 6.4.

Although § 1983 is not a source of substantive rights, it provides a method for vindicating federal rights elsewhere conferred by the United States Constitution and federal statutes that it describes. *Lambert v. Williams,* 223 F.3d 257, 260 (4th Cir. 2000); *see also Albright v. Oliver,* 510 U.S. 266, 271 (1994). Accordingly, to state a cause of action under section 1983, a plaintiff must allege that (1) the defendant was acting under color of state law in the actions complained of; and (2) the defendant deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States. *Clark v. Link,* 855 F.2d 156, 161 (4th Cir. 1988); *see also West v. Atkins,* 487 U.S. 42, 49-50 (1988). The court discusses each element in turn.

---

[20] In Plaintiffs' July 2010 letter to the RSA, Plaintiffs allege discrimination on the basis of race *and gender.* [DE-11 at 3 n.5]. Plaintiffs, however, fail to allege any facts in their complaint, amended complaint or the letter to the RSA indicating discrimination on the basis of gender. To the extent Plaintiffs' complaint or amended complaint can be construed to allege gender discrimination, the court's equal protection discussion in Section C(2)(i) below concerning racial discrimination applies.

1. Color of Law

Generally, a public employee acts under the color of state law while acting in his or her official capacity or while exercising his or her responsibilities pursuant to state law. *West*, 487 U.S. at 50. The Supreme Court has broadly interpreted the color of law requirement, concluding that 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law. *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). In this case, according to Plaintiffs' allegations, all individual defendants are employees of the Division or one of its local offices and each bears either direct or indirect responsibility for consumer referrals to service providers, such as NCSE, and the processing and payment of invoices submitted by these providers. Compl. ¶¶ 1.8-1.12. Thus, when persons in these positions misuse their authority in the course of performing such duties, they necessarily act under the color of state law for purposes of § 1983. *See West*, 487 U.S. at 49-50 ("It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State."). Viewing the allegations in the light most favorable to Plaintiffs, they have sufficiently alleged facts with respect to the first element.

2. Deprivation of Rights

i. *Equal Protection and § 1981*

Race discrimination claims under sections 1981 and 1983 are evaluated under the same framework applied to Title VII claims. *Love-Lane*, 355 F.3d at 786 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)); *see also Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (§ 1983 claims); *Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 910 (4th Cir.

33

1989) (§ 1981 claims). In this case, to sufficiently plead a case of race discrimination, Plaintiffs must allege that NCSE (1) was a member of a protected class, (2) suffered an adverse action, (3) was qualified for the position, and (4) was treated differently than similarly-situated non-minority entities. *See D. J. Miller & Assocs. v. Ohio Dep't of Admin. Servs.* (*"Miller"*), 115 F. Supp. 2d 872, 879 (S.D. Ohio 2000) (analyzing minority-owned company's race discrimination claim against the state of Ohio under Title VII framework); *see also Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563 (7th Cir. 1989) (analyzing §1981 claim by a minority-owned company against a franchise with the city of Chicago for which it had contracted to work under Title VII framework).

In the instant matter, Plaintiffs are African-Americans and a minority-owned business and are therefore members of a protected class. Second, Plaintiffs have alleged they suffered an adverse action whereby NCSE was provided limited consumer referrals and received incorrect and untimely invoice payments. Third, the Division's award of a contract to NCSE demonstrates implicitly that the company was qualified for the position. *See Miller*, 115 F. Supp. 2d at 880. As to the fourth element, however, Plaintiffs have alleged only that NCSE was treated differently than a similarly-situated service provider, CWS. *See* Compl. at 7 n.14, 9 n.26, ¶ 3.31. Plaintiffs have failed to allege, however, that CWS is a non-minority company. That is, Plaintiffs have failed to allege that they were treated differently than someone outside the protected class. Although Plaintiffs have alleged a statement attributed to Klah regarding Pitts' race, the meaning of this statement and impact on Plaintiffs' showing is vague. *See* Compl. ¶ 3.110. Ultimately, this single allegation fails to raise a reasonable inference that defendants are liable for alleged misconduct. *See Ashcroft*, 129 S. Ct. at 1949. Although the court must read Plaintiffs' complaint liberally, the court cannot ignore Plaintiffs' failure to allege facts setting forth a cognizable claim. *See Weller*, 901 F.2d at 391.

34

Because Plaintiffs have failed to set forth sufficient allegations that defendants discriminated against Plaintiffs on the basis of race, the court recommends DISMISSAL of Plaintiffs' equal protection claims.

ii. *Due Process*

In their complaint, Plaintiffs claim that the individual defendants violated Plaintiffs' Fifth and Fourteenth Amendment rights to due process.[21] Compl. ¶¶ 3.24, 4.9-4.13. However, beyond mentioning the phrase "right to due process," Plaintiffs fail to address the nature of the due process violation which they allege to have occurred. Relying simply on a legal catchphrase is not sufficient to state a claim for relief. *See Iqbal*, 129 S. Ct. at 1949 (explaining conclusory statements will not suffice).

Nonetheless, any due process claim by Plaintiffs must be based on a violation of procedural due process rights. Substantive due process protects fundamental rights created by the Constitution, *see Huang v. Board of Governors of Univ. of North Carolina*, 902 F.2d 1134, 1142 n. 10 (4th Cir. 1990) and "[t]he Supreme Court has been reluctant to expand the scope of substantive due process beyond 'matters relating to marriage, family, procreation, and the right to bodily integrity.'" *Lewis v. Bd. of Educ.*, 262 F. Supp. 2d 608, 616 (D. Md. 2003) (*quoting Albright v. Oliver*, 510 U.S. 266, 271-72 (1994)); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (explaining substantive due process protects those fundamental rights "deeply rooted in this Nation's history and tradition, and

---

[21]  Any due process claim by Plaintiffs must be grounded in the due process clause of the Fourteenth Amendment because the due process clause of the Fifth Amendment applies to actions by the *federal* government. *Qwest Communs. Corp. v. City of Greensboro*, 440 F. Supp. 2d 480, 493 (M.D.N.C. 2005) (emphasis added). While the "takings clause" of the Fifth Amendment applies to the states through the Fourteenth Amendment, Plaintiffs do not allege a "taking." *See Dolan v. City of Tigard*, 512 U.S. 374, 383 (1994).

implicit in the concept of ordered liberty"). Plaintiffs' complaint contains no factual allegations concerning deprivation of such fundamental rights. Rather, Plaintiffs' allegations concern the deprivation of alleged rights pursuant to an alleged contract with the state of North Carolina. To the extent Plaintiffs seek to allege substantive due process claims against the individual defendants, these claims should be DISMISSED. *See Lewis*, 262 F. Supp. 2d at 616 (explaining plaintiff's alleged "right to her job, if any, was created by state law, and does not implicate substantive due process"); *Myers v. Town of Landis*, 957 F. Supp. 762, 770 (M.D.N.C. 1996) (same).

The Due Process Clause of the Fourteenth Amendment requires the government to provide certain procedural protections whenever it deprives an individual of property,[22] which the Supreme Court has defined as the "interests that a person has already acquired in specific benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of . . . "property" interests within the meaning of the Due Process Clause of the Fifth and Fourteenth Amendment"). The first step in assessing any due process claim, therefore, is to ensure that the plaintiff actually has a cognizable property interest that has been jeopardized by governmental action. *See American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). In the absence of such an interest, no due process claim can proceed.

Property interests are created not by the Constitution itself; rather, they are created and their dimensions defined by independent sources such as state statutes, regulations, municipal ordinances,

---

[22] Of course, the due process clause protects not just property, but also liberty. However, Plaintiffs fail to allege any facts indicating defendants deprived Plaintiffs of a constitutionally recognized liberty interest. Accordingly, the court does not consider whether any of the alleged facts constitute the type of harm necessary to trigger a liberty-related due process claim.

university rules, and express or implied contracts. *Roth*, 408 U.S. at 577; *cf. Peace v. Employment Sec. Comm'n*, 349 N.C. 315, 321, 507 S.E.2d 272, 277 (1998) ("State law determines whether an individual employee does or does not possess a constitutionally protected 'property' interest in continued employment"). In order to have a constitutionally protected property interest in a particular benefit, a claimant must have more than "an abstract need and desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577.

In order to obtain relief in the present case, Plaintiffs must show that their service contract with the Division created a property interest. Plaintiffs fail to allege a property interest. Moreover, the North Carolina Administrative Code, which promulgates standards governing community rehabilitation programs, such as NCSE, provides, *inter alia*, that "[t]he inclusion of a provider of community rehabilitation services on the Division's list of approved vendors *shall not commit the Division to utilize the available services*" and "[t]he Division *shall not provide any provider of community rehabilitation services with a guarantee of a total dollar commitment or number of total client referrals* during any specific time frame except if determined as a condition of a federal grant or a contract." 10A N.C.A.C. § 89D.0204(b)(2),(3) (emphasis added). Accordingly, Plaintiffs lack an enforceable expectation of consumer referrals (i.e., a property interest), and consequently, cannot maintain a claim under § 1983 for a procedural due process violation.

However, even if the MOA between DHHS and NCSE created a property right, those rights would arguably not give rise to a § 1983 claim. *See Blackwell v. Mayor of Delmar*, 841 F. Supp. 151, 156 (D. Md. 1993) ("The law is well-settled that an ordinary breach of contract is not actionable under § 1983."); *see also Coastland Corp. v. County of Currituck*, 734 F.2d 175, 178 (4th Cir. 1984)

37

("[a] mere breach of contractual right is not a deprivation of property without *constitutional* due process of law . . . . Otherwise, virtually every controversy involving an alleged breach of contract by a government . . . would be a constitutional case.") (emphasis in original) (quoting *Medina Jimenez v. Almodovar*, 650 F.2d 363, 370 (1st Cir. 1981)); *Dover Elevator Co. v. Arkansas State Univ.*, 64 F.3d 442, 446 (8th Cir. 1995) ("[T]he assertion that 'any time one has an *enforceable* contract to which the State is a party, there is constitutionally protected property interest under that contract . . . is inconsistent with the concept' of the Fourteenth Amendment") (emphasis in original) (quoting *Medical Laundry Serv. v. Univ. of Ala.*, 906 F.2d 571, 573 (11th Cir. 1990)). As the Seventh Circuit has explained,

> [t]he question when contracts with a state agency create constitutional property is less momentous than might appear. All states provide judicial remedies for breach of contract and these remedies will almost always provide all the process that is constitutionally due, making the question whether the contract right was also a property right academic.

*Ind. Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004). Here, Plaintiffs dispute the meaning of the MOA and thus an opportunity to litigate the breach of contract claim is all the process due. *Mid-American Waste Sys. v. City of Gary*, 49 F.3d 286, 291 (7th Cir. 1995) ("The adequacy of litigation as a means to determine the meaning of a contract is a premise of our legal system. [The] opportunity to litigate in [state] court[] . . . therefore is all the process 'due' for ordinary claims of breach of contract."). Accordingly, the court recommends DISMISSAL of Plaintiffs' due process claims.

## D.    Racial Discrimination under Title VI, 42 U.S.C. § 2000d

In their complaint, Plaintiffs invoke Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), as a jurisdictional basis on which to sue defendant; however, Plaintiffs have not alleged any

38

factual bases to support such a cause of action. Compl. ¶ 2.1. To the extent Plaintiffs allegations may be construed to state a cause of action under Title VI, the claim fails.

Section 601 of Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.§ 2000d. The statute is intended to apply to "programs and activities involving three parties: a federal agency, a state or local intermediary administering the program, and an ultimate beneficiary." *Soberal-Perez v. Heckler*, 717 F.2d 36, 39 (2d Cir. 1983). "Because Title VI is intended to ensure that 'no person' is subject to discrimination in federally assisted programs, private parties function as thirty-party beneficiaries to these contracts." *Id.* at 40. Some courts have found that a plaintiff need only be in the zone of interests sought to be protected by Title VI. *See Bogdan v. Housing Auth. of Winston Salem*, No. 1:05CV00568, 2006 U.S. Dist. LEXIS 94129, at *16, 2006 WL 3848693, at *6 (M.D.N.C. Dec. 29, 2006) (allowing a plaintiff's claim "so long as he has a logical nexus to a federally funded program; meaning that he is either an intended beneficiary, an applicant, or a participant") (citing *Md. State Conf. of NAACP Branches v. Md. Dep't of State Police*, 72 F. Supp. 2d 560, 567 (D. Md. 1999)). Plaintiffs have alleged that DHHS receives federal funding to provide vocational rehabilitation services, and that Plaintiffs have a contract with DHHS to provide job placement opportunities to disabled workers. Plaintiffs have alleged they are private third parties who arguably benefit from the federal funding provided to DHHS. *See Bogdan*, 2006 WL 3848693, at *7.

Title VI prohibits only intentional discrimination, not "disparate impact" practices. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir.

2003). A cause of action for intentional discrimination under Title VI is thus appropriately analyzed under the elements of a Title VII claim. *Jane v. Bowman Gray Sch. of Med.-N.C. Baptist Hosp.*, 211 F. Supp. 2d 678, 690 (M.D.N.C. 2002). The court has already addressed Plaintiffs' claims of unlawful race discrimination in violation of sections 1981 and 1983 under the Title VII analysis and has concluded these allegations fail to state a claim for relief. Since Plaintiffs' Title VI discrimination claim is based on the same allegations as their section 1981 and 1983 claims, the court recommends DISMISSAL of Plaintiffs' Title VI claim.

## E. Disability Discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 794

In Plaintiffs' complaint, Plaintiffs invoke jurisdiction based on the "Rehabilitation Act," and cite 34 C.F.R. § 76.500, which lists federal statutes and regulations on nondiscrimination, including Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[23] *See* Compl. § 2.1. Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." Neither Plaintiffs' complaint nor amended complaint contain factual allegations of discrimination against Plaintiffs on the basis of handicap. In their 18 July 2010 letter to the RSA, Plaintiffs criticize the state's administration of its vocational rehabilitation programs. [DE-11 at 1]. In particular, Plaintiffs contend the state has no policy in place to identify individuals with the most significant disabilities ("MSD").[24] [DE-11 at 5]; *see* 29 U.S.C. § 795k (discussing

---

[23] In their letter to the RSA, Plaintiffs cite various sections under title 29 of the United States Code, including sections 101, 102, 624 and 625, in support of their Rehabilitation Act discussion. [DE-11]. Sections 101 and 103, however, concern jurisdictional concerns in matters affecting employers and employees while sections 624 and 625 concern age discrimination in employment.

[24] 29 U.S.C. § 705 provides that "[t]he term 'individual with a most significant disability', used with respect to an individual in a State, means an individual with a significant disability who meets

40

requirements for state plans concerning "supported employment services for individuals with the most significant disabilities"). As such, Plaintiffs argue they "can[not] do [their] work to assist this already disadvantaged class of individuals without it first being established that the consumer is in fact MSD and eligible for the services [NCSE has] been authorized to provide." [DE-11 at 7]. Accordingly, Plaintiffs contend the state should lose its federal funding given "supported employment services . . . cannot be properly delivered" in accordance with the Rehabilitation Act. [DE-11 at 6].

Federal jurisdiction may not be premised on the mere citation of federal statutes. *Weller*, 901 F.2d at 391. Moreover, the "district court [does not have] an obligation to *sua sponte* raise and address any and every claim that might arguably be presented by the facts as presented." *Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997). Rather, a plaintiff is obligated to assert a cognizable claim, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Here, Plaintiffs allege no discrimination on the basis of handicap and thus do not state a cognizable claim under the Rehabilitation Act.

Given the court recommends dismissal of Plaintiffs' federal claims, it recommends the district court decline to exercise supplemental jurisdiction over Plaintiffs' state law claims for breach of contract, defamation, intentional infliction of emotional distress and violation of Executive Order 13 of the Governor of North Carolina against the DHHS employees in their individual capacities.

---

criteria established by the State under . . . [29 U.S.C.S § 721(a)(5)(c)]."

## VI. CONCLUSION

For the reasons stated above, this court ALLOWS Plaintiffs' applications [DE-7, DE-8] to proceed *in forma pauperis*, Plaintiffs' motion to amend [DE-9] their complaint and Plaintiffs' motion to supplement [DE-11]. In addition, this court RECOMMENDS that Plaintiffs' amended complaint [DE-10] be DISMISSED and Plaintiffs' motion to seal [DE-11] be DENIED AS MOOT.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 20th day of August, 2010.

_____
Robert B. Jones, Jr.
United States Magistrate Judge

42